UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sonia Guilfoyle, | ) | Civil Action No. 5:14-4454-TMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Carolyn W. Colvin, Acting Commissioner of Social Security Administration, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff, appearing through counsel, brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I.     Relevant Background

   A.     Procedural History

On June 24, 2011,[1] Plaintiff filed an application for DIB alleging a disability onset date of July 29, 2008. Tr. 275. After being denied both initially and on reconsideration, Tr. 100, 133, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 179-80. On July 23, 2013, the ALJ conducted a hearing in Fresno, California,[2] taking testimony from Plaintiff and

---

[1] Although the Application Summary refers to a date of July 7, 2011, Tr. 275, Plaintiff's Disability Determination and Transmittal notes the filing date as June 24, 2011, Tr. 100.

[2] At the time of her application and administrative hearing Plaintiff was a resident of California. When Plaintiff filed her federal Complaint Plaintiff was a resident of South Carolina. *See* ECF No. 1 at 1.

from a vocational expert ("VE"). Tr. 48-86. The ALJ issued a decision on August 15, 2013, denying Plaintiff's claims. Tr. 36-47. The Appeals Council subsequently denied Plaintiff's request for review, thereby making the ALJ's decision the Commissioner's final administrative decision for purposes of judicial review. Tr. 1-4. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on November 18, 2014.  ECF No. 1.

B.    Plaintiff's Background

Plaintiff, born on November 11, 1958, was 49 years old as of her alleged onset date of July 29, 2008. Tr. 309. She completed high school and four or more years of college. Tr. 288. In 2002 Plaintiff also completed training to become a Certified Breastfeeding Consultant. *Id.* Plaintiff's prior work history includes work as a Clinical Coordinator, Labor & Delivery Registered Nurse for a hospital, and as a Labor & Delivery staff RN travel nurse for a nursing agency. Tr. 289. In her July 2011 Disability Report Plaintiff indicated the following conditions limit her ability to work:

> (1) Spondilosis/spondilothesis (sic), upper extremety (sic) damage; (2) spondylolsis (sic)/spondylolisthesis L5-S1; (3) multilevel degenerative disease of lumbosacral spine; (4) multilevel degenerative disc disease; (5) severe bilateral facet/ligamentous arthropathy; (6) posterior fracture of the right inferior facet of L5; (7) difuse (sic) disc bulge L5 over S1; (8) acute stress fractures bilat. L5 & right S1 pedicles; (9) ADHD; (10) bilateral cubital tunnel syndrome; [and] (11) bilateral carpal tunnel syndrome.

Tr. 287. In this same report Plaintiff further explained why she stopped working as follows:

> The injuries incurred to my upper extremities bilaterally and subsequent surgeries left me with significant physical limitations and weakness. The required further surgeries for Carpal Tunnel Syndrome and Cubital Tunnel Syndrome require significant time for healing and rehabilitation. My Neck [is] currently being assessed for further nerve damage involved in this [workers compensation] case. My MDs state that I cannot return to the work I did. Additionally, MRIs, CT Scan, & Xrays of my Lumbar spine from 2007 to 2011 shows significant deterioration and explains the intensity of the pain I live with. I cannot walk, stand, bend, kneel, squat or even sit for short periods of time without experiencing debilitating pain. I have been advised that I will not heal from the fractures in my spine and that surgical intervention will not make things better and could make

> my back worse. As a result I require significant doses of narcotic medications to get thru the day. I am not able to return to work.

Tr. 288. In a December 26, 2011 letter to the Social Security Administration seeking reconsideration of her claim, Plaintiff provided the following information regarding her injuries:

> On July 29, 2008 I suffered an injury at work that left me torn muscles and nerve damage to both my arms, elbows, wrists and hands. The injury was in fact a result of cumulative trauma to my upper extremities sustained over time while working in the Labor & Delivery unit of Hanford community hospital. This particular hospital did not enforce safety regulations with respect to the use of stirrups during the pushing phase of vaginal deliveries. Instead, most of the doctors and midwives insisted that the nurse assisting the patient hold and support the patient's legs by holding the leg up, putting the patient's foot against the nurse's shoulder while she pushed with each contraction.

Tr. 339-40.

    C.    The Administrative Hearing

        1. Plaintiff's Testimony

Plaintiff and her counsel appeared at her administrative hearing held in Fresno, California on July 23, 2013. *See* Tr. 48-86. In response to questions from the ALJ Plaintiff testified that she was divorced with three adult children ages 30, 25, and 21. Tr. 52-53. Plaintiff stated that she lived in a house with a roommate and she possessed a driver's license but only drove once or twice a month because she did not own a vehicle. Tr. 53. Plaintiff testified that she borrowed a car and drove herself to the hearing. Tr. 54. Plaintiff confirmed that she had a high school education plus four years of college. She stated that she received a degree in nursing and her license was in good standing. *Id.* Plaintiff testified that she has not done any type of work since her alleged onset date of July 29, 2008. Tr. 55. Plaintiff testified that she worked previously for Geneva General Hospital as a labor and delivery nurse. In 2000 she also worked part-time for Professional Choice as a nurse in a nursing home. *Id.* Plaintiff testified that she later worked for Millennium Medical Services as a travel nurse and went to California. Tr. 56. Plaintiff stated that in 2006, 2007, and 2008 she worked as an independent contractor travel nurse. *Id.* When asked

3

by the ALJ what prevented her from working, Plaintiff testified that in 2008 she tore muscles in both her arms and shoulders and was still having difficulty with her hands. Tr. 57. Plaintiff stated that she drops items inadvertently and "[does not] have the strength to open like a bottle or whatever." *Id.* Plaintiff testified that her job as a labor and delivery nurse put a lot of stress on her body and her back and the problems with her back "became significantly worse to the point where [she is] in constant pain and just trying to deal with that." *Id.* Plaintiff stated that she has fractures in her back but has been told that surgery to repair the fractures will leave her more disabled. *Id.* Plaintiff testified that she had a worker's compensation claim that determined she was 35 percent disabled and she received payments for two-and-a-half years, however she kept open the medical portion of the claim. Tr. 58. Plaintiff testified that she takes her prescribed medications on a regular basis and the pain medicine makes her pain "somewhat tolerable if [she is] not over stressing or putting stress on, specifically [her] lower back and the neck." Tr. 58-59. Plaintiff testified that the Cymbalta somewhat controlled her depression symptoms but doctors were still adjusting the dosage. Tr. 59. Plaintiff stated that she has side effects from the medication, including "nausea and inability to sleep." *Id.* Plaintiff testified that she has had surgery on both shoulders but surgery has not been recommended for her back because doctors felt "that the outcome of the surgery would be more debilitating and more pain that what [she is] experiencing currently." Tr. 60. Plaintiff stated that she had three epidural steroid injections in the past three years but they did not help. Tr. 60-61. Plaintiff testified that she was continuing to do physical therapy and she also wore a back brace that was given to her by a doctor. Tr. 61. Plaintiff stated that the brace "just seems to help for maybe a couple of hours, but then it seems that position of [her] back, whatever, starts hurting even more." *Id.* Plaintiff testified that she had also used a TENS unit[3] but was not getting any results with it and used it only periodically. *Id.*

---

[3] TENS stands for (Transcutaneous Electrical Nerve Stimulation) and the units are predominately

4

Plaintiff stated that she did not use a cane or other assistive device. Tr. 61-62, Plaintiff testified that she sees a psychiatrist "who is mainly involved with [her] ADHD" but she also talks to her about "depression, memory loss, [and] difficulty organizing things." Tr. 62. Plaintiff testified that she is in pain "[e]very day, 24 hours a day, seven days a week." *Id.* She stated the pain is located in her lower back and shoulders; she has residual pain from the surgeries and pain in her wrists, her hands, and her elbows. *Id.* She stated that she also has pain in her joints, her knees, and her ankles and if she walks for more than 10 or 15 minutes her "feet start really hurting significantly." Tr. 62-63. Plaintiff stated she has had issues with swelling and taking medication. Tr. 63. To help with the pain Plaintiff testified that besides taking pain medication and doing stretching exercises she tries to get off her feet and limit what she does on a daily basis. *Id.* Plaintiff stated that any kind of activity—such as lifting, carrying, walking, twisting, sitting, and bending—made her pain worse. *Id.* Plaintiff described the pain in her lower back as a "tightening knot" that was a constant, achy, throbbing pain. Tr. 64. Plaintiff testified that the pain radiated down her arms to her hand and down her legs to her feet—particularly down her right leg. *Id.* Plaintiff stated that if she sat in one spot for an hour the pain would start affecting her back and she would "have to get up, walk around, [and] maybe lay down." Tr. 65. Plaintiff stated she could stand for 30 minutes before needing to sit down, and could walk for "maybe a block" before needing to stop. *Id.* Plaintiff stated that she did not know whether she could continue walking because the pain in her foot and her legs and hips did not stop at that point. *Id.* Plaintiff testified that she could lift a gallon of milk with two hands but could not lift a case of soda with two hands. Tr. 66. Plaintiff stated that she could bend over and pick an item up that was dropped,

---

used for nerve related pain conditions (acute and chronic conditions). TENS machines work by sending stimulating pulses across the surface of the skin and along the nerve strands. The stimulating pulses help prevent pain signals from reaching the brain. TENS devices also help stimulate the body to produce higher levels of its own natural painkillers, called "endorphins." *See* http://tensunits.com/ (last visited Dec. 29, 2015).

but not without pain. *Id.* Plaintiff testified that she has problems reaching overhead with both arms and avoids reaching. She stated that she also has issues with her hands that cause her to inadvertently drop items and if she writes continuously for more than 10-or-15 minutes her wrists ache and her hand starts to become numb. Tr. 66-67. Plaintiff testified that if she tried to type for more than 15 minutes her hands would start to cramp and she would have a lot of pain and numbness. Tr. 67. She stated that she is able to use fasteners such as buttons or zippers to put on her clothes. *Id.* Plaintiff testified that her "short-term memory is very, very poor." *Id.* She stated she remembers to take her medications because she takes most of them "at the same time in the morning and then the pain medication is what [she] take[s] throughout the day." Tr. 67-68. She stated that if she forgets to take the medication on time she starts feeling withdrawals, so either the pain or the withdrawals will remind her to take the medication. Tr. 68. Plaintiff stated she has concentration problems, but mentally could follow simple instructions. Tr. 68-69. Plaintiff stated she also had problems making decisions but generally did not have problems relating to or getting along with people. Tr. 69.

Plaintiff stated that on a typical day she gets up in the morning and has a cup of coffee sitting or stretching out on the couch. She testified that when she wakes up she usually has a "hard time even walking to the bathroom and starting the day" so she takes her medications right away although it "takes about an hour for them to kick in so that [she] can start to move a bit." Tr. 70. She then will so some personal hygiene, take another break, and try to do some of her physical therapy exercises. *Id.* She stated that around noon she will shower and get dressed, and then if she is feeling better she will try to do a little laundry or the dishes. After that she will have to stretch her back out and sit. In the evening she will make something to eat, watch television, read a book, and then go to bed. *Id.* Plaintiff stated she has problems sleeping because she is unable to get comfortable due to pain in her shoulder and lower back. Tr. 71. Plaintiff stated that

6

on average she gets four hours of sleep at night and she does not take naps during the day. *Id.* Plaintiff testified that she does not need assistance bathing or dressing. *Id.* Plaintiff stated that in addition to washing dishes or doing laundry she is also able to do light dusting, prepare microwavable meals, mop the bathroom, pay her bills through her online checking account, and could occasionally "pick up a few things" shopping. Tr. 72-73. Plaintiff testified that she was unable to take out the trash, do yard work or gardening, and that her roommate did those tasks in addition to doing most of the shopping. *Id.* Plaintiff stated that she did not go to church or belong to any clubs or organizations, she did not visit with friends or family, did not go to movies or restaurants, did not do any outside activities, did not go to sporting events or concerts, and did not go for walks. Tr. 73. Plaintiff stated she used a computer to pay bills and although she had a Facebook account she did not use it. Tr. 73-74. Plaintiff stated her two oldest children lived in New York and her youngest child lived in South Carolina. Tr. 74. Plaintiff stated she used to ride horses but could no longer do that, and she does not have any pets or animals. *Id.*

In response to questions from her attorney Plaintiff testified that in April 2012 she had a radiofrequency ablation on her back but that the procedure did not help reduce her symptoms. Tr. 74. Plaintiff stated that she also went through a full treatment of acupuncture but it did not help. Tr. 75. Plaintiff stated that the progression of the problems with her back "became significantly worse than what it was. Now it's basically intolerable . . . without the massive amount of pain medication" that she takes. *Id.* Plaintiff testified that her entire nursing career was in labor and delivery along with periodic work in nursing homes. Tr. 75-76.

The ALJ noted that the records mentioned a voucher for education and asked Plaintiff if she ever tried to return to school. Tr. 76. Plaintiff testified that she had not because she could not write or type for any prolonged period of time and her memory was "terrible." *Id.* She felt that trying to go to school "would be a waste of money, really." Tr. 77.

2.  The VE's Testimony

VE Cheryl R. Chandler also testified at the hearing. Tr. 78, 261-62. She characterized Plaintiff's past work in nursing under the Dictionary of Occupational Titles ("DOT") number 075.364-010 with an SVP of 7, skilled work, and medium exertional level but medium-to-heavy as performed. Tr. 78. VE Chandler stated the DOT did not have a specific designation for the specialty of labor and delivery nurse, nor was there a specific designation for travel nurse. *Id.* The ALJ posed the following hypothetical:

> Assume a hypothetical individual with the claimant's age and education with the past job you identified. Further assume this individual is limited to occasional lifting and carrying up to 20 pounds and frequently up to 10; stand and/or walk up to six hours and sit for six to eight hours in an eight hour workday with normal breaks; frequently balancing; occasional stooping, kneeling, crouching, crawling, and climbing; occasional overhead reaching; and needs to avoid concentrated exposure to vibration and extreme cold and avoid even moderate exposure to hazards.

Tr. 79. The ALJ asked if the hypothetical individual would be able to perform Plaintiff's past work and the VE responded "[n]ot with the lifting [as] so limited." *Id.* The ALJ asked if the past work would have transferrable skills to lesser exertional levels. *Id.* The VE responded that a "lot of nurses move into nurse case management and, obviously, with a little training they'll go into billing and coding and bill review and that kind of classification." *Id.* The ALJ asked what acquired skills would be transferrable and the VE noted "medical knowledge, the procedures, [and] classifications." Tr. 80. The ALJ asked about a job as an "advice nurse" providing medical advice over the telephone and the VE responded that type of job would be classified under the same DOT as a registered nurse but functioning at the light to sedentary level and using a computer to enter notes of the conversation. Tr. 80-81. The VE noted that the DOT classification would be the same because this type of job would be post-2000 and the DOT was 1990; therefore she based the classification on her personal experience with Kaiser and as a vocational rehab person. Tr. 81. The VE testified that the hypothetical individual would be able to do the

8

transferable job of registered nurse in the sedentary classification and there were 15,000 positions available in California. Tr. 81-82. The VE noted that the jobs of office nurse, staff occupational health nurse, and school nurse were all classified as light and skilled work. Tr. 82. The VE suspected that the sedentary position of nurse consultant was "a little higher skill level or at least would take some training to move into the consulting capacity from just a general duty nurse." Tr. 82-83.

The ALJ further limited the hypothetical individual to simple, routine tasks and confirmed with the VE that limitation would eliminate transferrable work. Tr. 83. The ALJ asked if there would be any light, unskilled jobs that such an individual could perform and the VE identified the following:

> Ushers in theaters are light, unskilled, SVP 2 jobs, 344.677-014. There's like 11,000 jobs in California in that classification. Cashiers, reduced 10 percent for the overhead shoulder . . . that's light, unskilled; SVP 2; DOT number 211.462-010; approximately 100,000 jobs. . . . A sales attendant, light, unskilled; SVP 2; DOT 299.677-010; 10,000 in California. All the numbers cited are California times nine for the nation.

Tr. 83-84. The ALJ posed another hypothetical with "the same hypothetical individual limited to lifting and carrying less than five pounds; standing and/or walking for less than two hours and sitting for less than two hours in an eight hour workday; no balancing, stooping, kneeling, crouching, crawling, or climbing; no reaching or handling; limited to occasional fingering; and would likely miss four days per month." Tr. 84. The ALJ asked if there would be any work for such an individual and the VE responded no work would be available. *Id.* The ALJ asked if the hypothetical individual would be able to perform the jobs with the transferable skills if the individual would miss at least two days per month. *Id.* The VE responded "[n]ot on a consistent basis . . . . Sometimes the work is very flexible, but – at the higher skill levels you get a little more flexibility, but if those are missed days [that] were scheduled, then no." *Id.*  The VE

9

confirmed that her testimony was consistent with the DOT. Tr. 85. Plaintiff's counsel had no questions for the VE. *Id.*

II.   Discussion

   A.   The ALJ's Findings

In his August 15, 2013 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since July 29, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc and joint disease; shoulder degenerative joint disease; mild carpal tunnel syndrome; mild cubital tunnel syndrome; right elbow lateral epicondylitis; an bilateral shoulder impingement, right biceps tendon rupture, left labral tear and biceps subluxation with tendinitis with subsequent operative intervention of both shoulders (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently balance. She can occasionally stoop, kneel, crouch, crawl, and climb. She can occasionally reach overhead. She must avoid concentrated exposure to vibration and extreme cold. She must avoid even moderate exposure to hazards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 11, 1958 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10

9.  The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 29, 2008, through the date of this decision (20 CFR 404.1520(g)).

Tr. 41-47.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[4] (4) whether such impairment prevents claimant from performing past relevant work ("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step). A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpt. P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") which the Social Security Administration ("the Agency") considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at step three).

(4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *see also Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1973).

C.     Analysis

Plaintiff argues that the ALJ erred by: (1) failing to consider her impairments in combination; (2) failing to perform a proper credibility analysis; and (3) failing to properly weigh the opinion evidence. Pl's Br. 16-22, ECF No. 16.

1.     Step Three Findings

a.     The ALJ's Analysis of Plaintiff's Combined Impairments

Plaintiff's first allegation of error is that, other than a "single boiler-plate sentence" the ALJ failed to properly analyze the cumulative effect of Plaintiff's impairments and did not explain what impact the combination of impairments had on her residual functional capacity ("RFC"). Pl.'s Br. 17-18. Plaintiff also asserts the ALJ failed to apply the special technique for evaluating mental impairments and did not consider her ADHD and knee impairments in his RFC analysis. *Id.* at 19.  The Commissioner argues the ALJ adequately considered the combined effects of Plaintiff's impairments and specifically considered her physical and mental impairments throughout the decision. Def.'s Br. 14-15, ECF No. 18. The Commissioner further contends that Plaintiff "fails to identify any limitations supported by the record for which the ALJ did not account" and "Plaintiff cannot point to any credibly established functional limitations resulting" from her ADHD. *Id.* at 15-16. In response Plaintiff asserts that "rather than refute the Plaintiff's argument, the defendant's assertions in this matter only serve to highlight the inescapable conclusion that the ALJ did not meet the 'adequate explanation' requirement advanced in *Walker* and clearly established by the long line of other cases that have followed in its footsteps." Pl.'s Reply Br. 5, ECF No. 20.

In evaluating a claim for DIB, the Commissioner is required to consider the combined effects of a claimant's impairments, and she must adequately explain her evaluation of the combined effects of those impairments. *See Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir.

1989); *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423(d)(2)(c), and a general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987). In this regard, it has been held that a reviewing court is entitled take an ALJ's statements regarding his consideration of a combination of impairments as true unless circumstances exist that call such statements into doubt, and that an ALJ's discussion of the various steps of his analysis does not have to be made under a particular heading in the decision. *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (taking the ALJ at his word when he stated that he considered all of the claimant's impairments in combination); *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (discussion and evaluation of evidence for a particular step of analysis does not have to be under a certain heading; decision as a whole is considered).

Here, at step three the ALJ determined "[t]he impairments listed in Appendix 1, Subpart P, 20 CFR Part 404, which are most nearly applicable to the claimant's medically determinable impairments, particularly Sections 1.02, 1.04, and 12.02, have been reviewed and are not met or medically equaled under the facts of this case." Tr. 42. It is not clear from this portion of the decision or from the decision as a whole whether the Commissioner considered the combined effects of Plaintiff's impairments. Other than the initial boilerplate finding that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments," nowhere else in his decision does the ALJ refer to the combined effects of all of Plaintiff's impairments—severe and non-severe, physical and mental. Even if the claimant's impairment or impairments in and of themselves are not "Listed impairments" that are considered disabling per se, the Commissioner must also "consider the combined effect of all of the individual's impairments without regard to whether any such

15

impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see also Walker*, 889 F.2d at 50 (finding the ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them."). "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." 889 F.2d at 50.

The Commissioner argues that "the ALJ specifically considered Plaintiff's physical and mental impairments throughout the decision." Def.'s Br. 14. While this may be true, there is no specific indication in the ALJ's decision that informs the court that the ALJ adequately considered Plaintiff's impairments in combination "throughout the decision." Plaintiff asserts that in making his RFC analysis the ALJ "did not square these [RFC] conclusions with the evidence relating to [Plaintiff's] back, shoulder, and hand impairments. He did not explain the impact of having pain at several joints at the same time, and he certainly did not explain the impact of [Plaintiff's] non-severe ADHD and knee impairments." Pl.'s Br. 19. The undersigned agrees. The ALJ's decision does not include findings or discussion to show the ALJ considered Plaintiff's combined impairments; therefore, the court cannot properly review his decision or recommend a finding that the ALJ's determination is based on substantial evidence. The undersigned recommends the case be remanded for the ALJ's specific consideration and explanation of the combined effect of Plaintiff's impairments. In making this recommendation the undersigned does not suggest that Plaintiff's combined impairments necessitate a finding of disability.

b.      Analysis of Plaintiff's Mental Impairments

Plaintiff also argues the ALJ failed to apply the special technique in evaluating her mental impairments and the ALJ's RFC analysis is silent as to her ADHD. Pl.'s Br. 19. The regulations provide steps that must be applied in evaluating mental impairments. 20 C.F.R. § 404.1520a. The ALJ must follow a "special technique" to determine the severity of a claimant's

mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate the presence of a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. 20 C.F.R. § 404.1520a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C.

Here, the ALJ found Plaintiff's ADHD to be a non-severe impairment, Tr. 41, and determined she had mild limitation in the areas of activities of daily living, social functioning; and in the area of concentration, persistence, and pace. Tr. 42. The ALJ also found that Plaintiff "has experienced no episodes of decompensation which have been of extended duration." *Id.*

In his RFC analysis the ALJ discussed the opinion of Plaintiff's treating psychiatrist. Tr. 45. On August 29, 2012, Plaintiff's psychiatrist, Dr. Huiwen Hao, completed a Medical Source Statement-Psychiatric/Psychological. Tr. 1497-98. Noting that he was treating Plaintiff for a 10-year history of ADHD with good response to Adderall, Dr. Hao opined that Plaintiff had no impairments in her ability to relate and interact with supervisors and co-workers; ability to understand, remember and carry out simple one-or-two step job instructions; ability to deal with the public; or ability to handle funds. *Id.* He opined that Plaintiff had a minimal impairment in her ability to maintain concentration and attention for at least two-hour increments, and was moderately impaired in her ability to understand, remember and carry out an extensive variety of technical and/or complex job instructions; and in her ability to withstand the stress and pressures associated with an eight-hour work day and day-to-day work activity. *Id.* Dr. Hao noted that

Plaintiff had "recently reported some memory problems." Tr. 1498. He also noted that Plaintiff had no side effects from her medication other than minor sleep problems but that the form of Adderall was changed to help with sleep problems. *Id.* Although the ALJ did not refer to Plaintiff's ADHD impairment by name in his RFC analysis, the ALJ referred to Dr. Hao's August 2012 opinion and noted that "Dr. Hao's treating record showed no indication that the claimant's mental condition resulted in a work related limitation and Dr. Hao's record showed the claimant was stable with treatment and had few symptoms." Tr. 45.

The undersigned finds Plaintiff's argument on this point is without merit because the ALJ properly performed the special technique for assessing the severity of a claimant's mental impairments. *See* Tr. 42. Furthermore, in his RFC analysis the ALJ adequately considered Plaintiff's ADHD when discussing the opinion of Plaintiff's treating psychiatrist. *See* Tr. 45.

### 2. Plaintiff's Remaining Allegations

Plaintiff also argues that the ALJ failed to perform a proper credibility analysis and failed to properly weigh the opinion evidence. Pl.'s Br. 19-23. The Commissioner argues that substantial evidence supports the ALJ's credibility determination and supports the weight assigned by the ALJ to Plaintiff's treating physicians. Def.'s Br. 16-22. Because the undersigned finds the ALJ's failure to properly explain his step three findings is a sufficient basis to remand the case to the Commissioner, the undersigned declines to specifically address Plaintiff's additional allegations of error. However, upon remand, the Commissioner should take these allegations into consideration.

### III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the

foregoing, the undersigned cannot determine that the Commissioner's analysis of the combined effect of Plaintiff's impairments is supported by substantial evidence or is without legal error.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.

January 13, 2016                                                                                   Kaymani D. West
Florence, South Carolina                                                                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**